IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Donna Marie Manwaring,            Case No. 3:11 CV 102

          Plaintiff,            MEMORANDUM OPINION
                                           AND ORDER

     -vs-

                                        JUDGE JACK ZOUHARY

Erick Martinez, et al.,

          Defendants.

### INTRODUCTION

Benjamin Franklin once said: "Promises may fit the friends, but non-performance will turn them into enemies." Such is the case here, where two former lovers, Plaintiff Donna Manwaring and Defendant Erick Martinez, dispute the existence of a business partnership agreement. Plaintiff alleges she is an equal partner entitled to half the value and profits of two limited liability companies -- NELDA and NORG. After several amendments to the pleadings (Docs. 9, 23, & 25), a Motion to Dismiss (Doc. 12), and numerous extensions (Docs. 15, 17, 18, 20), two claims remain: breach of contract (Count I) and promissory estoppel (Count II).

Before this Court is Defendant's Motion for Summary Judgment, which argues Count I should be dismissed because there was no meeting of the minds or, in the alternative, that the Statute of Frauds bars enforcement of the alleged agreement (Doc. 40 at 6–11). Defendant also seeks dismissal of Count II, arguing no promise was made or, assuming there was a promise, Plaintiff did not detrimentally rely on it (Doc. 40 at 11–15). The matter has been fully briefed (Docs. 45 & 48), and a record hearing was held (Doc. 50).

## BACKGROUND

In 2006, Plaintiff and Defendant were executives with Denny's, a restaurant chain. In August of that year, Defendant, who was vice president of operations for the eastern United States, promoted Plaintiff to regional director. Their relationship quickly turned intimate (Doc. 45-1 at ¶¶ 11–12). Also during this time, Denny's began to emphasize franchise-owned, as opposed to corporate-owned, restaurants (Doc. 45-1 at ¶¶ 13–15). As a result of this shift, Defendant was laid-off by Denny's in September 2007. Shortly thereafter, Plaintiff and Defendant, believing they could benefit from the shift to franchise-owned stores, agreed to start a venture that would acquire, own, and operate Denny's franchises (Doc. 45-1 at ¶ 16).

Plaintiff kept her job with Denny's since she could oversee the transition of the corporate restaurants and also receive a bonus for every corporate restaurant in her territory that was transitioned to a franchise operation. Plaintiff alleges these bonuses -- between $1,000 and $2,000 each -- were used to help with the cost of setting up the new business with Defendant (Doc. 45-1 at ¶ 17). The bonuses totaled approximately $18,000 (Doc. 45-1 at ¶ 116). Aside from this small capital contribution, Defendant supplied the remainder of the money to acquire and operate the Denny's franchises. Plaintiff's role in the new organization would be to oversee the restaurant operations, including human resources, personnel, compensation, marketing, and communications. Plaintiff contends the agreement with Defendant was that she would be an equal partner, each owning 50% of the venture (Doc. 45-1 at ¶¶ 23–24).

In October 2007, Plaintiff and Defendant met with an attorney to prepare the operating agreement for their business. They decided to indicate Defendant as the sole owner because Plaintiff was still employed by Denny's. Plaintiff was expected to be laid-off soon, and then the operating

2

agreement would be amended to reflect her 50% ownership. Shortly after that meeting, NELDA, LLC, was formed and purchased four Denny's restaurants in northern Ohio. The purchase was completed in December 2007 (Doc. 45-1 at ¶¶ 27–28 & 37).

The personal relationship grew more intimate, and Defendant moved in with Plaintiff in May 2008. Plaintiff was laid-off the following month and received unemployment until February 2009. During this time, she worked for NELDA and, although she did not receive a salary, Defendant paid for some of her expenses and also leased a Lexus for her (Doc. 45-1 at ¶¶ 41–42). NELDA acquired two more Denny's restaurants during the summer of 2008, but Plaintiff was still not added as a partner on the operating agreement (Doc. 45-1 at ¶¶ 44–48).

Meanwhile, Plaintiff was going through a divorce, and Defendant assured Plaintiff that he too was divorcing his wife. Defendant told Plaintiff he did not want to add her to the NELDA operating agreement until her divorce was final. Plaintiff agreed, admitting she was in love with Defendant and intended to marry him (Doc. 45-1 at ¶¶ 52–53).

By March 2009, Plaintiff was divorced from her husband. However, Defendant did not add Plaintiff to the operating agreement as promised. Instead, Plaintiff was put on the NELDA payroll for an annual salary of $110,000, although she only received $40,000, for child support and some bills. Additionally, Defendant gave Plaintiff $25,000 to help pay off her husband's equity interest in the marital home. Other funds were transferred to Plaintiff from NELDA as needed (Doc. 45-1 at ¶¶ 61–64).

Over the next three months, NELDA continued operations and acquired four more Denny's restaurants. Plaintiff handled the day-to-day operations, including conducting meetings and arranging the finances for the newly-acquired restaurants. Plaintiff and Defendant attended conferences together

3

in Las Vegas and Hawaii and various parties and meetings across Ohio where Defendant referred to her as his "partner" (Doc. 45-1 at ¶¶ 67–68). Indeed, Defendant repeatedly called Plaintiff his partner and referred to her as such in various e-mails, franchise agreements and other business related documents.

Things began to sour in August 2009. At that time, Defendant removed Plaintiff from the NELDA bank account and substituted his wife, Ana Martinez (Doc. 45-1 at ¶¶ 52–54). When Plaintiff discovered the change, she sent Defendant the following e-mail (Doc. 45-1 at ¶ 54):

> Hey slimeball . . . I have an e-mail from you stating to pay myself so I am. No problem. I can call [A]na tonight.

Defendant responded (Doc. 45-1 at ¶ 54):

> I am not going to take any of your threats and you should be careful what you do with the company cash. This is not how a partner behaves by the way.

Defendant, however, backed away from this accusatory position and eventually assuaged Plaintiff's concerns, justifying the change as a precautionary measure to prevent her husband from accessing NELDA funds and as a way for his wife to access the funds in case something happened to him (Doc. 45-1 at ¶¶ 55–57).

The following month, Plaintiff and Defendant learned that Denny's was planning to open restaurants in Flying J truck stops. The parties believed this was a great opportunity to expand their venture and decided to purchase two restaurants using the retained earnings of NELDA. A new company, NORG, LLC, was formed and, despite Defendant's promises to the contrary, Plaintiff was not included on the operating agreement.

In September 2009, the personal relationship between Plaintiff and Defendant continued to breakdown. Plaintiff sent an old flame an e-mail (Doc. 45-26 at 1):

4

> Hi Tom . . .
> I hope all is well with you. I am writing this in hopes you can forgive me for everything wrong I did to you. I miss our friendship so bad!!! I miss the three amigos. Life has been so different. We were such great friends and you never tried to change who I was. I wish I still had that. You helped me through many difficult times in my life and I hope I helped you. It wasn't the right time for us and I apologize for taking advantage of your friendship. You are an amazing friend . . . You deserve great things in life! Please dont [sic] respond I just want you to know how truly sorry I am and wanted to make things right.

Defendant intercepted this e-mail and responded (Doc. 45-26 at 1):

> Every time we have a disagreement you reach out to passed [boyfriends]. Is this how a partnership of [a] million dollar company should be? So you say you cant [sic] trust me and that I lie? What about you? Why do you do this when you are mad? How does this make us look?

Suspecting Defendant was just making excuses not to bring her in, Plaintiff began to press Defendant for a formal recognition of her ownership interest in NELDA (Docs. 45-1 at ¶¶ 95–96 & 45-29 at 1). In January 2010, the ownership dispute came to a head. Plaintiff repeatedly asked to put their agreement in writing and she withheld sex on one occasion. Defendant changed the passwords to the NELDA bank accounts; Plaintiff changed them back. Defendant accused Plaintiff of hacking into the corporate bank account; Plaintiff threatened legal action if she was not added as a partner (Doc. 45-1 at ¶¶ 100–103 & 106).

On January 11, 2010, making good on earlier threats, Plaintiff contacted Defendant's wife through Facebook and left a message on her phone. Defendant called Plaintiff and fired her (Doc. 45-1 at ¶¶ 108 & 111). The following day, Defendant's wife called Plaintiff and told her she knew about the affair. Plaintiff admitted that she loved Defendant. Defendant's wife asked Plaintiff not to ever call her house again (Doc. 45-1 at ¶ 112).

Even after Plaintiff was fired, Defendant sent her $8,000 from NELDA. Additionally, Defendant paid Plaintiff's landscaper through 2010. The parties continued to engage in their intimate

5

relationship, although Defendant stopped sending Plaintiff money once she retained counsel. Occasionally, Defendant would contact Plaintiff by phone and play "Don't Stop Believin'" by Journey (Doc. 45-1 at ¶¶ 113–114). Apparently, the parties have been unable to "hold onto the feelin'."

## STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

## ANALYSIS

In diversity, federal district courts generally apply state substantive law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). A district court applies the law of the state in which it sits, *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941), and is bound by the decisions of the state's highest court. *Meridian Mut. Ins. Co. v. Kellerman*, 197 F.3d 1178, 1181 (6th Cir. 1999).

Accordingly, this Court applies Ohio law to the parties' dispute.

**Count I: Breach of Contract**

Defendant argues Plaintiff's breach of contract claim fails for two reasons. First, there was no meeting of the minds because the alleged oral agreement did not specify the essential terms of the contract (Doc. 40 at 9). Second, even if a contract existed, it would be barred by the Statute of Frauds because the contract was not in writing and was not capable of being performed in one year (Doc. 40 at 12). This Court agrees that the Statute of Frauds bars enforcement of the partnership agreement and, accordingly, it need not address whether there was a meeting of the minds as to all the essential terms.

"Agreements that do not comply with the statute of frauds are unenforceable." *Olympic Holding Co., LLC., v. Ace Ltd.*, 122 Ohio St. 3d 89, 94 (2009). The Ohio Statute of Frauds, Ohio R.C. § 1335.05, provides:

> No action shall be brought . . . upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

The Ohio Supreme Court has interpreted this statute:

> For over a century, the "not to be performed within one year" provision of the Statute of Frauds, in Ohio and elsewhere, has been given a literal and narrow construction. The provision applies only to agreements which, by their terms, cannot be fully performed within a year . . . . Thus, where the time for performance under an agreement is indefinite, or is dependent upon a contingency which may or may not happen within a year, the agreement does not fall within the Statute of Frauds.

*Sherman v. Haines*, 73 Ohio St. 3d 125, 127 (1995).

Plaintiff first argues that because the agreement was for an indefinite term, it does not fall under the statute (Doc. 45 at 18). Indeed, courts in Ohio have held that partnership agreements without a definite term are able to be performed within a year because partnerships can be dissolved

7

at any time. *See, e.g.*, *Samman v. Nukta*, 2003 WL 132303, at *6 (Ohio Ct. App. 2003); *Cloud v. Baldwin*, 1997 WL 67757, at *3 (Ohio Ct. App. 1997); *Bryan v. Looker*, 94 Ohio App. 3d 228, 234 (Ohio Ct. App. 1994) (citing 3 JAEGER, WILLISTON ON CONTRACTS (3d Ed. 1960) 576–78, Section 495).

However, this does not end the inquiry. This Court also considers whether the parties intended the alleged agreement to last more than a year. *Olympic Holding Co., LLC*, 122 Ohio St. 3d at 98 (citing *Pro Arts Inc. v. K Mart Corp.*, 580 F. Supp. 1073, 1075 (N.D. Ohio 1984)). If so, the Statute of Frauds bars enforcement of the unwritten agreement.

Plaintiff's deposition testimony reveals that the agreement was intended to last longer than a year (Doc. 46 at 18):

| [Counsel]: | Under this contract that you believe you had, how long were you supposed to remain an owner? |
| [Plaintiff]: | Indefinitely. |
| [Counsel]: | Years and years? |
| [Plaintiff]: | Yes. We were going to be together. We did everything together. |

Plaintiff also contends that even if the intended agreement was to exceed one year, the record contains a collection of writings that satisfies the Statute of Frauds (Doc. 45 at 19–20). In particular, Plaintiff points to various franchise applications filled out by both parties (Docs. 45-21 & 45-22). These franchise applications contain a box where the applicant may identify other business partners. In separate applications, Plaintiff identified Defendant and vice-versa. The applications also contain a box where the applicant may include a description of his or her "Investment Capital, Management/Operations Structure, and Development" (Docs. 45-21 at 1 & 45-22 at 1). At the record hearing, Plaintiff's counsel directed this Court to pay particular attention to Defendant's description, which reads in its entirety (Doc. 45-21 at 1):

8

> We have capital to continue to grow our business. Our structure has an HR and Operations partnership. We are developing employees and managers in our current Denny's locations in Cleveland, OH. We would like to expand to fast food restaurants as part of our growth initiatives.

While that statement may evidence Defendant's intention to form, or even believe that there was, a partnership between him and Plaintiff, it does not constitute a final agreement satisfying the Statute of Frauds. *See Olympic Holding Co., LLC*, 122 Ohio St. 3d at 99 (holding an unsigned rough draft of an agreement exchanged by the parties did not satisfy the Statute of Frauds). Likewise, Defendant's passing, and perhaps colloquial, references to the partnership in e-mails and memos are also insufficient.

Because the parties intended the partnership to last more than one year, and because there is no signed writing indicating its terms, the alleged agreement is rendered unenforceable by the Statute of Frauds. Accordingly, Count I of the Complaint is dismissed.

**Count II: Promissory Estoppel**

Defendant also seeks to dismiss Plaintiff's promissory estoppel claim, alleging no such promise was made or, in the alternative, that Plaintiff did not detrimentally rely on that promise. Promissory estoppel is an appropriate remedy for the breach of an oral promise made unenforceable by the Statute of Frauds. *Id.* at 97. "To be successful on a claim of promissory estoppel, [t]he party claiming the estoppel must have relied on conduct of an adversary in such a manner as to change his position for the worse and that reliance must have been reasonable in that the party claiming estoppel did not know and could not have known that its adversary's conduct was misleading." *Id.* (quotations omitted).

Even if this Court assumes there was a definite promise, and that reliance on that promise was reasonable, Plaintiff's claim still fails because she cannot show detrimental reliance. Plaintiff alleges

9

reliance in three ways. First, she contributed $18,000 of her own money to help NELDA get off the ground. Second, she worked for NELDA without pay from September 2007 through February 2009. Third, she generally contributed her knowledge and expertise to keep NELDA running smoothly and efficiently (Doc. 45 at 16–17).

### *The $18,000 Contribution*

Plaintiff alleges she invested $18,000 in NELDA because she believed she was a partner (Doc. 45 at 17). As support, she cites to the affidavit attached to her Opposition to Defendant's Motion, which states that she believes this money was used by NELDA because Defendant had control of the account (Doc. 45-1 ¶ 17). However, that allegation is at odds with her deposition testimony (Doc. 46 at 29–30):

| [Counsel]: | So the bank account solely in your name with approximately $18,000 in it, sitting here today do you know whether any of that money was spent for NELDA related purposes? |
| --- | --- |
| [Plaintiff]: | No, I do not. |
| [Counsel]: | Do you have any reason to believe it was? Have you seen anything that would indicate to you that it was? |
| [Plaintiff]: | No. |
| [Counsel]: | Are you aware of any documents that would demonstrate that your FGI bonuses were contributed to NELDA? |
| [Plaintiff]: | No. |

Plaintiff provides no such justification or evidence other than the affidavit. This Court will not consider parts of the affidavit directly contradictory to her deposition. "A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Aerel, S.R.L. v. PCC Airfoils, LLC.*, 448 F.3d 899, 908 (6th Cir. 2006).

*Uncompensated Work*

Plaintiff also argues she relied on Defendant's promise when she began working for NELDA in September 2007 while still working for Denny's. She alleges she was not paid by NELDA for this work to her detriment. However, Plaintiff actually benefitted from this work because she received bonuses from Denny's for transferring restaurants to NELDA. Apart from the bonuses, Plaintiff was getting paid by Denny's to do what she was doing for NELDA, as one of her job responsibilities was to facilitate the transfer of restaurants to franchisees (Doc. 46 at 6). A bonus for doing something one is already required to do is not detrimental reliance.

Plaintiff next argues she was uncompensated by NELDA for the work she did after being laid off by Denny's in June 2008 and that she only agreed not to be paid because she relied on Defendant's promise of ownership (Doc. 45 at 7). However, "detrimental reliance upon the promise must be of a sufficiently definite and substantial nature so that injustice will result if the 'promise' is not enforced." *Miller v. Lindsay-Green*, 2005 WL 3220215, at *11 (Ohio Ct. App. 2005) (quotation omitted). This Court cannot identify a "sufficiently definite" and "substantial" detriment to Plaintiff after she was laid off from Denny's.

First, there is nothing in the record indicating she was fired from Denny's because of her employment with NELDA. Second, there is no evidence Plaintiff turned down other employment after being laid off and the mere failure to seek other employment is not sufficient to establish detrimental reliance. *See, e.g.*, *Wing v. Anchor Media, Ltd.*, 59 Ohio St. 3d 108, 111 (1991). Indeed, Plaintiff's own deposition indicates she was unemployed during this time and even received unemployment benefits (Doc. 46 at 34). Plaintiff also received a severance package from Denny's for six months that included approximately $67,000 -- half of her annual pay -- plus stocks (Doc. 46

at 33 & 35).  Third, although Plaintiff did not receive a salary, she *was* compensated for her work because, as she admitted in her deposition, "[i]f I needed money, I took it out of the NELDA account. I had debit cards.  I had check books.  I had all the access in the world . . . . I would pay for everything with NELDA credit cards."  (Doc. 46 at 39).  Plaintiff also received $25,000 from Defendant so that she could pay off her husband's equity in their home.  Based on this compensation, Plaintiff did not work to her detriment.  *See Zelina v. Hillyer*, 165 Ohio App. 3d 255, 261 (Ohio Ct. App. 2005) (finding no detrimental reliance where plaintiff received clothing, housing, and cars while working for defendant).

### *Contributed Knowledge and Expertise*

Plaintiff's final argument is that her time and effort, as well as her knowledge and expertise, were dedicated to NELDA because she thought she was a partner (Doc. 45 at 16–17).  As discussed above, Plaintiff was compensated for her work, including her knowledge and expertise.  Indeed, after February 2009, and until she was fired in January 2010, Plaintiff received a salary from NELDA, as well as the use of a company car and other paid expenses.  Again, she fails to allege that she turned down employment outside of NELDA during this time.  Further, there were no discussions regarding what salary she should, or would, receive, nor did Plaintiff turn down any part of her salary because she thought she was a partner of NELDA.  Simply put, Plaintiff has failed to produce evidence that her reliance on Defendant's promise was detrimental, and this Court dismisses Count II of the Complaint.

**CONCLUSION**

Mixing business with pleasure can have unpleasant consequences. Such is the situation here. The importance of reducing agreements to writing is also a lesson learned from this case. The very purpose of the Statute of Frauds is to avoid the contested "he said, she said" record presented by the parties.

Defendant's Motion is granted and the Complaint is dismissed.

IT IS SO ORDERED.

                                                s/ *Jack Zouhary*
                                              JACK ZOUHARY
                                              U. S. DISTRICT JUDGE

May 31, 2012